UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Cinnecole Lee,

       Plaintiff,

v.                                                                    Civil No. 10-3892 (JNE/JJK)
                                                  ORDER

K Mart Corporation,

       Defendants.

       Plaintiff Cinnecole Lee (Lee) brought this action against Defendant K Mart Corporation

(Kmart), alleging racial discrimination in violation of Title VII, 42 U.S.C. § 20002-2(a), and the

Minnesota Human Rights Act (MHRA), Minn. Stat. § 363A.08, subdiv. 2.  Lee, an African-

American woman, asserts that she was racially discriminated against when Kmart terminated her

employment after an incident in which Lee made physical contact with a customer.  Kmart

moved for Summary Judgment on both the Title VII and MHRA claims.  For the reasons stated

below, Kmart's motion is granted.

## I.  BACKGROUND[1]

       Lee began her employment with Kmart as a Loss Prevention Associate (LPA) at Kmart's

store in Burnsville, Minnesota, on June 20, 2005.  As an LPA, Lee was responsible for detecting,

reporting and preventing external and internal theft incidents, and training store associates in the

area of loss prevention.  In November 2005, Lee was promoted to Loss Prevention Coach (LPC)[2]

at the Richfield, Minnesota store.  She resigned from her LPC position in August 2006, but a few

weeks later was rehired as an LPA at the New Hope, Minnesota store.  In November 2007, Lee

---

[1]      The facts described below are undisputed or are those that a reasonable fact-finder could find when viewing the record in the light most favorable to Lee.

[2]      LPCs are also referred to as "Loss Prevention Managers" and "Loss Control Managers."

transferred to the Lake Street store in Minneapolis, Minnesota.  In early 2008, Mike Brosam became the LPC at the Lake Street store and was Lee's direct supervisor until the date of her termination.  The Store Manager at the Lake Street store was Dan Lawler, who also supervised aspects of Lee's performance.  During her employment, Lee was an excellent employee.  Prior to September 2008, Lee had never been disciplined and her managers consistently reported that Lee was a top performer and did her job well.

Kmart has two policies related to the use of force in the workplace.  The Workplace Violence Policy prohibits threatening behavior and acts of workplace violence, including conduct such as slapping.  Employees who engage in violent, abusive, or threatening behavior on Kmart premises can be subject to disciplinary action, up to and including termination.[3]  The second policy applies only to the Loss Prevention (LP) employees and is related to the procedures that apply to shoplifting apprehensions.  This policy, known also as the "No Touch" or "Hands Off" Policy, prohibits LP employees from touching a suspected shoplifter's body, clothes, or possessions.  Under this policy, if a shoplifting apprehension cannot be completed due to a threat of violence or bodily harm, the apprehension must be terminated.  However, when the LP employee cannot safely remove herself or a witness from a potentially violent situation, the LP employee may use limited forms of restraint on the suspect.  This is sometimes referred to in shorthand by employees as the "self-defense exception."  Lee received training on and understood both of these policies.  On a number of occasions, LP employees have used physical contact in connection with detaining shoplifters.  Some of the incidents were captured on a

---

[3]      Lee asserts that the Workplace Violence Policy does not apply to LP employees.  There is no support for this contention in the record.

2

"Greatest Hits" videotape, which some LP employees and managers viewed.[4]  Lee claims that the incidents captured on the tape did not result in termination.  However, between 2008 and 2010, four LPAs (other than Lee) were terminated for violating Kmart's "Hands Off" Policy—three of these employees were Caucasian, and one was African-American.

In September 2008, the LPC at the Anoka store went on maternity leave.  Keith Cockriel, the District Loss Prevention Manager, assigned Lee to cover that LPC position.  Jay Gullickson was the Store Manager at the Anoka store, and Bryan Ruby was the Assistant Manager.  On September 15, 2008, Lee's first day working in the Anoka store, Lee observed a Caucasian woman stealing items.  She called Ruby to assist her in stopping the shoplifter.  The shoplifter was holding a baby and was accompanied by a female shopping companion.[5]  When Lee confronted the shoplifter, the shoplifter took the items out of her bag and said she did not want them.  Lee asked the shoplifter to come to the Loss Prevention office in the back of the store with her, and the shoplifter complied.  As they walked toward the back of the store, the shoplifter's companion followed behind them, yelling and swearing.  Lee repeatedly told the companion to calm down.  When Ruby, Lee and the shoplifter entered the back area through the double swinging doors, Lee told the companion not to enter.  As described by Lee in her deposition, while they were in the hallway of the back area, the companion opened the swinging doors, swore, flailed her arms, pointed her fingers in Lee's face, and repeatedly yelled, "you're a nigger on a power trip."  Ruby and Lee pushed back on the doors, but the companion pushed through.  Lee testified that based on the companion's tone, volume, and flailing arms, Lee believed that the

---

[4]      It is unknown who created the videotape or when it was created.  Lee believes the tape was created by LP staff.  It is unclear whether, or which, managers may have viewed the video.  The videotape was destroyed sometime in the spring of 2008.  Brosam Dep. 55.

[5]      The race of the companion does not appear in the record, but the parties assert that she, too, was Caucasian.

companion was going to hit her.  Lee raised her left arm to block and tapped/slapped the

companion on the right cheek, telling her to leave the area.[6]  The companion did so.  Ruby called

the Anoka police, who removed the companion and the shoplifter from the store.

After the police left, Lee called Brosam, her supervisor at the Lake Street store, and told

him about the incident.  Lee cannot recall whether she told Brosam about the customer's flailing

arms or that she believed that she needed to respond in self-defense.  Brosam called Gullickson,

the Anoka Store Manager, and asked him to collect statements from witnesses.  But for this

phone call, Brosam had no involvement in any investigation into Lee's conduct or the eventual

decision to terminate her employment.  The day after the incident, Ruby also told Gullickson

about what he had witnessed.  Gullickson and Ruby together called Cockriel, and Ruby relayed

his version of the events.  Cockriel and Gullickson asked Ruby to write a statement, which he

did.  Ruby's statement explained that after the companion called Lee derogatory names, Lee

"gave her a slap in the face to get her attention."  It did not mention a risk of physical violence or

need for self-defense.

On September 17th, Cockriel and Lee spoke on the telephone about the incident.  Lee

described the incident, but does not recall telling Cockriel about the companion's flailing arms or

that Lee felt that the companion was going to hit her.[7]  Cockriel did not think that anything

would come of the incident, but asked Lee to email him a quick summary of the events.  Lee

typed a summary, which explained that Lee and Ruby apprehended a female shoplifter, and as

they were bringing her to the "employee's only entrance" in the back of the store,

---

[6]     It is disputed whether Lee slapped the companion because she felt physically threatened,
as she contends, or whether she did it as a reaction to the inflammatory language or to get the
companion's attention.  For purposes of this motion, we take Lee's version of the facts as true.

[7]     Lee believes she told Cockriel that she had been acting in self-defense, but cannot
specifically recall telling him that.  Lee Dep. 117:1-10.

> [the companion] pushed her way through the doors and was asked again by Lee to remain outside of them. [The companion] refused. [The companion] began to yell and swear. Lee opened the door and told [the companion] to exit. [The companion] yelled, "No, this is bullshit, your just a 'Nigger' on a power trip!" I reacted with a quick tap with my right hand to the left side of [the companion]'s check. I said, "I am not a nigger and you need to leave!" [The companion] then repeated, "You are, you are a nigger!" I opened the door and [the companion] stepped back. As the door was closing, [the companion] once again tried to push it open. I pushed on the door to get it to close fully and it did.

The statement did not include additional information indicating that the companion physically threatened Lee or that Lee felt the need to act in self-defense. Cockriel forwarded the statement to Michael Smith, the Regional Director of Human Resources, and recommended to him that no disciplinary action be taken. Cockriel was directed to contact Kmart's Associate Services Organization (ASO), which provides, among other things, guidance regarding performance management and terminations. ASO Human Resources Consultant Leslie Elliott was assigned to the call. Elliott requested copies of the witness statements. After forwarding the paperwork to Elliott and recommending no—or at most minor—discipline, Cockriel had no further involvement in the investigation or decisionmaking.

Meanwhile, Smith (Regional HR Director) consulted with Ken Basil, the Regional Loss Prevention Manager. Basil was ultimately responsible for the LP programs in his region, which included the Anoka store.[8] Based on the statements from Lee and Ruby, Basil believed that Lee's conduct violated the LP "Hands Off" Policy and merited termination. Smith agreed. Smith spoke with Elliott (ASO HR Consultant), who reviewed the statements and concluded that Lee's conduct violated the Workplace Violence Policy and warranted termination. Elliott

---

[8]    Lee disputes that Basil was involved in Lee's termination. However, Lee points only to alleged contradictions between Basil's affidavit and other testimony regarding Basil's conversations with Cockriel and Elliott. There is no genuine factual dispute that Basil spoke with Smith about Lee's conduct and was consulted in connection with Lee's termination.

believed that although the customer's racial comments were inappropriate and offensive, they did not give Lee the right to make physical contact.  Lee's conduct, Elliott believed, put Kmart at risk for an assault charge.  Smith agreed with Elliott's assessment.  Elliott called Dan Lawler (Lake Street Store Manager) and recommended to him that Lee be terminated.[9]  On September 23, 2008, Lawler, who had not been involved in the investigation, called Lee into the office and informed her that her employment was terminated due to her physical contact with the companion.  The official reason coded in the termination paperwork was violation of the Workplace Violence Policy, not the LP "Hands Off" Policy.

## II.   DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A)-(B).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

---

[9]     It is disputed whether Elliott's communications were "recommendations" or orders.  For purposes of this motion, the Court accepts Lee's view that they were only recommendations. Lee argues that because Lawler has the authority to terminate employees, he was a decisionmaker in her termination.  The record does not support this argument—everyone, including Lawler, testified that he in this instance was merely a messenger.  Regardless, for this summary judgment motion the Court will analyze the issues as if Lawler had been a decisionmaker.

Title VII prohibits employment discrimination on the basis of race, gender, religion, or national origin. 42 U.S.C. § 2000e-2(a). The Court applies the same analysis to Title VII and MHRA claims when they are based on identical facts and theories. *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011). Lee does not contend, and the record does not show, that there is any direct evidence that Kmart terminated her because of her race. Absent direct evidence of discrimination, Title VII claims are analyzed under the *McDonnell Douglas* burden-shifting framework. To establish a *prima facie* case of race discrimination, Lee must first show that: (1) she is a member of a protected group; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) there are facts that permit an inference of discrimination. *See Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011). If successful, this creates a rebuttable presumption of discrimination. *Id.* The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *Id.* If the defendant does so, the burden shifts back to the plaintiff to show that the proffered reason was pretext for discrimination. *Id.*

**A. Prima Facie Case**

It is undisputed that as an African American, Lee is a member of a protected group, and that she suffered an adverse employment action when her employment was terminated. Kmart argues that Lee has not met her burden of demonstrating that she was meeting Kmart's reasonable expectations or that there are any facts that permit an inference of race discrimination.

Kmart asserts that Lee did not meet Kmart's legitimate performance expectations at the time of the event that led to her termination. As an LP employee, Lee was expected to "make appropriate decisions in stressful situations" and abide by Kmart's "Hands Off" Policy. However, at this stage of the analysis, Lee "is not required to disprove [Kmart]'s reason for

firing [her]." *Lake v. Yellow Transportation, Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).  Lee

"establishes [her] prima facie case if, setting aside [Kmart]'s reason for firing [her], [she] was

*otherwise* meeting expectations or *otherwise* qualified."  *Id.*  Lee has presented evidence that

prior to the incident on September 15, 2008, she had been performing very well, received

positive performance evaluations, and her supervisors thought highly of her.  Lee has met her

burden of production for this element.

To permit an inference of discrimination, a plaintiff can show that she was treated

differently than other similarly situated employees who are not members of the protected group.

*See Gilmore v. AT&T*, 319 F.3d 1042, 1046 (8th Cir. 2003).  At the prima facie stage of the

*McDonnell Douglas* burden-shifting framework, the Eighth Circuit applies the "low-threshold

standard for determining whether employees are similarly situated."  *Rodgers v. U.S. Bank, N.A.*,

417 F.3d 845, 852 (8th Cir. 2005).  "The burden of establishing a prima facie case of disparate

treatment is not onerous."  *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253

(1981)).  Under this standard, the plaintiff must show that she and other employees were

"involved in or accused of the same or similar conduct and [were] disciplined in different ways."

*Id.* (quoting *Wheeler*, 360 F.3d at 857).  For purposes of this motion, the Court will assume,

without deciding, that Lee has met her burden for this element.

Lee also argues that an inference of discrimination is permitted because Kmart "ratif[ied]

that racist hate speech was permissible."  Pl.'s Mem. Opp. 17.  Lee argues that because she was

"a victim of hate speech when she was repeatedly called 'nigger,'" she was justified in

responding with physical contact.  She asserts that Kmart "trivialized and marginalized this fact;

thus ratifying that racist hate speech was permissible."  *Id.*  First, the Court notes that Lee's

argument appears to concede that Lee acted in response to the speech itself.  Putting that aside,

there is no evidence to support Lee's argument that Kmart considered this highly inflammatory

and offensive speech to be "not important enough."  The undisputed evidence shows that Kmart

did *not* ignore the companion's offensive conduct—the police were called and the perpetrator of

the hateful speech was removed from the store and may have been charged with a criminal

offense.[10]  The fact that Kmart did not also allow its employee to strike the offending customer is

not evidence that Kmart condoned hate speech or that the supervisors involved in Lee's

termination were racially motivated.

## B.  Pretext

If the plaintiff establishes a *prima facie* case of discrimination, and the defendant

provides a legitimate, nondiscriminatory reason for its decision, the presumption of

discrimination disappears and the plaintiff must show that the proffered reason was pretext for

discrimination.  *Pye*, 641 F.3d at 1019.  Kmart has set forth a legitimate, nondiscriminatory

reason for terminating Lee—Lee violated Kmart's "Hands-Off" Policy and subjected it to

litigation risk.  "The burden to articulate a nondiscriminatory justification is not onerous, and the

explanation need not be demonstrated by a preponderance of the evidence."  *Rodgers v. U.S.

Bank, N.A.*, 417 F.3d 845, 853 (8th Cir. 2005).  Lee must therefore set forth evidence that

Kmart's explanation is merely pretext for racial discrimination.

To demonstrate a material question of fact regarding pretext, "[a] plaintiff may show that

the employer's explanation is 'unworthy of credence . . . because it has no basis in fact.'"

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011) (citation omitted).

"Alternatively a plaintiff may show pretext 'by persuading the court that a [prohibited] reason,

rather than the employer's stated reason, actually motivated the employer's action.'"  *Id.* (citation

---

[10]     Lee testified that she had heard that the woman was charged with disorderly conduct.
Lee Dep. 80:23-90:4.

omitted).  "A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision."  *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).

### 1.  *Disparate Treatment—Other Employees Not Terminated*

Lee argues that Kmart failed to follow its own policies because it allowed other LP employees to use "physical force for self defense, to effect detainments, recover merchandise, stop fleeing shoplifters, and anticipatorily thwart potential or perceived harm to themselves or others."  Pl.'s Mem. Opp. 19.  According to Lee, "[n]one of these incidents resulted in investigation, discipline or termination."  *Id.*  However, it is undisputed that Kmart had a well-known "Hands Off" Policy, which prohibited LPAs from making physical contact with customers unless they felt that they could not remove themselves from the situation otherwise. Lee argues that Kmart did not follow its "Hands Off" Policy in practice, and thus failed to follow its policy of *not* following its policy when it terminated her.  This is really an argument that Kmart selectively enforced its "Hands Off" Policy for her but preferentially ignored this policy for Caucasian LPAs.  In other words, the argument is that Kmart treated similarly-situated employees in a disparate manner based on race.

"At the pretext stage of the *McDonnell Douglas* burden-shifting framework, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one."  *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8th Cir. 2005).  A plaintiff "must show that she and the employees outside of her protected group were similarly situated in all relevant respects."  *Id.* "To satisfy this standard, '[t]he individuals used as comparators "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without

any mitigating or distinguishing circumstances."'" *Id.* (quoting *Gilmore v. AT&T*, 319 F.3d 1042, 1046 (8th Cir. 2003)); *see also Chism v. Curtner*, 619 F.3d 979, 984 (8th Cir. 2010) ("When different decision-makers are involved in terminating employees, the employees are rarely similarly situated in all relevant aspects.").

Lee argues that Caucasian LP employees used physical contact and were not terminated. However, there is no admissible evidence that these other employees were "similarly situated" to Lee "in all relevant respects."[11]   Lee must show that these other employees not only engaged in the same conduct (use of force in self-defense), but also that the same decisionmakers treated these other employees differently and that there were no mitigating or distinguishing circumstances.  While the record does not provide sufficient detail regarding other incidents in which LP employees used physical contact in self-defense, the Court will assume that such incidents occurred and that the circumstances were substantially similar to those in Lee's situation.  However, even though these other employees may have engaged in the same conduct as Lee, there is one critical distinguishing circumstance that sets these other employees apart: management's *knowledge or belief* that those other employees had acted in self-defense.[12]

---

[11]   Much of Lee's "evidence" is based upon information she learned from others, but of which she has no personal knowledge.  These hearsay statements are not admissible to defeat summary judgment.  *Mays v. Rhodes*, 255 F.3d 644, 648 (8th Cir. 2001) ("While we review the record in the light most favorable to . . . the non-moving party, we do not stretch this favorable presumption so far as to consider as evidence statements found only in inadmissible hearsay.").

[12]   There is actually one other notable difference between these incidents and Lee's.  Nearly all of the events Lee describes occurred at the Lake Street store, not the Anoka store where Lee's incident occurred.  LP employees at the Lake Street store appear to have dealt with shoplifting more frequently than LP employees at the Anoka store.  Lee testified that "Lake Street seemed to have a different [Hands Off] policy, but it wasn't written down."  Lee Dep. 216:5-6.  "It seemed to be the norm on Lake Street to touch people."  *Id.* at 23:16-17.  The Anoka store, in contrast, appears to have only rarely encountered shoplifters.  Lee Dep. 216:20-23 ("I actually believe they didn't have any shoplifters for the entire year."); Gullickson Dep. 24:21-25:8 ("[I]t wasn't a regular occurrence.  It was rare, in fact.").

Here, there is nothing in the record indicating that the managers involved in Lee's investigation or termination were specifically alerted to the fact that Lee's use of physical contact was in self-defense.  In both the oral and written statements Lee supplied to her managers, there is no evidence that Lee included information relating to the customer's flailing arms, pointing fingers, or overtly threatening behavior.  Lee's written statement indicated that after the companion said, "your [sic] just a 'Nigger' on a power trip," Lee "reacted with a quick tap with my right hand to the left side of [the companion]'s check" and said, "I am not a nigger and you need to leave!"  Lee justifies this omission by explaining that she did not understand "that the incident was going to go anywhere," so she just "typed a quick summary and emailed it to Mr. Cockriel the same day."  Pl.'s Mem. Opp. 9.  Lee's state of mind would not have been evident to Kmart management.  There is no evidence that she was given an unreasonably short (or, indeed any) time limit to submit her summary, and the document itself gives no indication that it is an incomplete statement of events.[13]  Lee "believed it was obvious that [she] was acting in self-defense" and did not feel the need to include those details in her summary.  Lee Dep. 120:11-16. She also could not recall telling Cockriel or any of the other managers that she had felt physically threatened or acted in self-defense at the time of the incident.  Instead, she "assumed" that they would know she had acted in self-defense.  Lee Dep. 120:1-121:9, 228:15-121, 230:13-15.  Ruby's witness statement indicated that after the companion called Lee derogatory names, Lee "gave her a slap in the face to get her attention."[14]  There is no evidence that based on the

---

[13]     The fact that Lee neglected to delete from the signature line the name of the person she was replacing does not carry that freight.

[14]     Lee disputes that this was the reason she slapped the companion, but there is no dispute that this was the information contained in Ruby's statement to management.

materials provided to management, the decisionmakers knew or believed that Lee had acted, or believed she acted, in self-defense as envisioned by the "Hands Off" Policy.

Lee appears to argue that the use of the word "nigger" in this context should have been sufficient to alert Kmart managers that the situation necessitated a physical response.  It is undeniable that this offensive language is highly inflammatory and demeaning.  Under some circumstances the word itself could be perceived as threatening.  *See Harris v. Int'l Paper Co.*, 765 F. Supp. 1509, 1516 (D. Me. 1991) ("The omnipresence of race-based attitudes and experiences in the lives of black Americans causes even nonviolent events to be interpreted as degrading, threatening, and offensive.").  Lee, however, testified that it was not the word that caused her to respond physically—as Lee explained, the customer's use of the word "wasn't the trigger."  Lee Dep. 223:20-23; *Id.* at 106:7-107:3 ("I wasn't necessarily worried about what she was saying to me.").  There is no evidence that Lee's managers suspected a need for self-defense based on the language or that their failure to so suspect was intentional or racially motivated. Lee has presented no evidence that the managers actually knew or believed that she had acted in self-defense.  Thus, because of this crucial distinguishing factor, Lee is not similarly situated to other employees whose use of physical force was known or believed to be in self-defense.

Lee also argues that there were a number of other LP employees who inappropriately used physical contact, but were not terminated for violating the "Hands Off" Policy.  However, to show that these employees were similarly situated to herself, she must show that the same decisionmakers treated her differently than they did these other employees.  "When different decision-makers are involved in terminating employees, the employees are rarely similarly situated in all relevant aspects."  *Chism v. Curtner*, 619 F.3d 979, 984 (8th Cir. 2010).  Thus, the individuals involved in her investigation and termination must have also been involved in the

13

investigations of these other employees.  At the very least, these individuals must have been aware of the other employees' use of physical force and also believed that their use was inappropriate (i.e., not in self-defense).

Although the parties dispute who the ultimate decisionmaker was in Lee's termination, it is undisputed that Ruby, Gullickson, Cockriel, Basil, Elliott, Smith, and Lawler were involved in some way with either the investigation or termination.  Even taking the broadest view of who the decisionmakers were, Lee points to no evidence that any of these seven individuals were aware of the described incidents involving other employees' use of physical contact, believed that these other employees' conduct was not in self-defense, or played any role in investigating these other incidents.[15]  In fact, there is no evidence that any of the described incidents were investigated at all.  Although Lee believes managers knew of other instances involving inappropriate use of force, unsubstantiated allegations are not sufficient to survive summary judgment.  *See Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003).  With no evidence that the same decisionmakers treated Lee differently than other employees, Lee's argument of disparate treatment must fail.  The proffered instances of similarly situated employees are as follows:[16]

---

[15]    Lee believes that Lawler knew of an incident involving inappropriate physical contact. However, her belief arises from a conversation she had with manager Fatima Ayubi, in which Ayubi supposedly told Lee that Ayubi was present when Lawler witnessed an incident in which an LPA used physical contact.  Lee Dep. 56:13-23, 57:12-18.  Inadmissible hearsay will not overcome a motion for summary judgment.  *Mays*, 255 F.3d at 648.  Lawler testified that he only witnessed physical force used in cases of self-defense.  Lawler Dep. 44-45.  Ayubi could not recall any conversation with Lee in which she discussed LP employees using force that was not in self-defense.  Ayubi Dep. 38:2-25.  Moreover, without any additional information about the alleged incident, Lee cannot demonstrate that the other LPA was similarly situated to herself.

[16]    The employees are identified here by their first name only, because this Order assumes— without them having an opportunity to rebut it—that these employees used unauthorized physical force.

Lee testified that in or around December 2007, she saw an LPC named Josh use physical force to detain a shoplifter at the Lake Street store. Assuming Josh's use of force was not in self-defense, there is no evidence that his supervisor, Todd Tieken, or any other managers were aware of the incident or of the inappropriate use of physical contact. There is no evidence regarding the information contained in the incident report or whether there was an investigation of Josh's conduct.

Sometime in 2007 or 2008, Lee saw an LPA named Joel inappropriately grab and push a shoplifter at the Lake Street store. The incident report Lee filled out did not indicate that Joel had used physical contact. Lee Dep. 32:18-33:1. Lee told manager Fatima Ayubi about the incident,[17] but there is no evidence whether any other managers were aware of the use of physical contact or whether there was any investigation. Ayubi was not Lee's supervisor at the time of her termination and was not involved in Lee's investigation or termination.

In 2007, Lee witnessed an incident at the Lake Street store in which LPA Jason chased after a shoplifting juvenile and grabbed and pulled off the shoplifter's sweatshirt. The shoplifter turned around, punched Jason, and ran off. Lee told Ayubi about the incident, but there is no evidence Lee informed Ayubi that Jason made the first physical contact and had not been acting in self-defense. The record does not show what information was contained in the incident report or whether there was any investigation. There is no evidence that any manager other than Ayubi was aware of this incident.

In 2008, Lee viewed a videotape depicting LPA Dave chasing a shoplifter through the parking lot of the Lake Street store, grabbing the shoplifter by his jacket and pulling him down.

---

[17]     Ayubi testified that she was only aware of LP employees using physical force in self-defense. Ayubi Dep. 38:2-25. For this motion, the Court assumes Ayubi was aware that this incident involved the *inappropriate* use of force.

Lee did not report the incident to management and there is no evidence regarding what information was contained in the incident report, whether anyone else reported the incident to management, or whether there was any investigation.

Lee also viewed a videotape of another incident occurring in 2008 at the Lake Street store. In that recording, LPC Mike Brosam, LPA Scott, and LPA Dave physically "floored" a shoplifter because they thought the shoplifter might reach into the bag he was carrying. Lee Dep. 68:4-18. Lee's own testimony acknowledges that the employees' use of force was in self-defense. Further, there is no evidence regarding what information was contained in the incident report, whether there was any investigation of the incident, or whether Lee's decisionmakers were aware of the incident.

Sometime in 2007 or 2008, Lee witnessed an incident in which LPA Scott inappropriately pulled a shoplifter to the floor. Lee did not fill out the incident report and there is no evidence regarding what information the report included. Lee informed manager Mike Brosam about the incident, but there is no evidence that any other managers were aware of the use of physical contact or whether any investigation ensued. Brosam was not involved in Lee's investigation or termination.

In 2008, Lee and Brosam were working together at the Lake Street store when they tried to detain a shoplifter. The shoplifter starting charging toward Lee, and Brosam put the woman in a head lock to stop the attack. Lee Dep. 247:7-248:20. Not only does Lee acknowledge that this use of physical contact was in her defense, but there is also no evidence that other managers knew about or investigated the incident.

Lee also testified that she viewed a number of other incidents on the "Greatest Hits" videotape, which no longer exists. First, Lee testified that she saw an LPA named Geo jumping

into a moving car to try to remove a shoplifter.  Lee also testified that she saw an LPA named

Adam "put a guy in a choke hold and put him to sleep."  It is unknown when these incidents

occurred, what events transpired prior to the depicted incidents, or whether any managers were

aware of or investigated the incidents.  Lee also testified that she saw a video recording of LPA

Joel clothes-lining a man with an open arm to the throat after the man was already handcuffed.

According to Lee, manager Mike Brosam also viewed this recording.  Lee Dep. 40:8-9.  Lee did

not observe the entire detention and there is no evidence regarding the events occurring prior to

the physical contact or the reason for the detention.  Nor is there evidence that Lee's

decisionmakers knew of or investigated the incident.

      Finally, it is undisputed that during the period of 2008-2010, four other LPAs were

terminated for violating Kmart's "Hands Off" Policy—three of these employees were Caucasian,

and one was African-American.[18]  Basil was involved in investigating and recommending

termination in all four cases, and Cockriel and Smith were involved in one employee's

investigation.  Lee argues that these four terminations are not similar since they involved

employees who violated Kmart policies in two different ways—e.g. inappropriate physical

contact *plus* some other violation.  However, it is not Kmart's burden to prove that these other

employees were similarly situated to Lee.[19]  As demonstrated by these four incidents, there is no

---

[18]    At one point in her brief, Lee argues that these four employees are irrelevant because the
events resulting in their termination occurred after Lee's termination, and thus are "unpersuasive
as to the practices that exited at the time Ms. Lee was terminated in September of 2008."  Pl.'s
Mem. Opp. 25.  However, she herself relies on the terminations of these employees when
arguing that they were afforded "due process" prior to termination.  Further, Lee proffers as
instances of similarly situated employees events that occurred at times other than September
2008, which arguably also do not represent the Kmart practices that existed at the time Lee was
fired.

[19]    Additionally, Lee argues that these four terminations evidence some sort of Kmart policy
that employees may only be terminated for committing two different violations of company

material dispute that Kmart did, in fact, apply its "Hands Off" Policy to Caucasian LPAs and used it as a basis for their termination.

Lee has failed to show that other non-terminated employees were similarly situated in all relevant respects.  Thus, there is nothing from which a reasonable juror could conclude that similarly situated employees were treated differently based on race.

### 2.  *Disparate Treatment—Other Employees Provided with "Due Process"*

Lee also argues that Kmart deviated from practice because it failed to provide her with "due process" before her termination.[20]  She claims that Caucasian LPAs who were terminated for violating the "Hands Off" Policy were first given "notice of the accusation against them, an opportunity to fully explain the situation, a conference call with corporate, and a personal interview with Mr. Cockriel."  Pl.'s Mem. Opp. 20.  Lee has provided no evidence that Kmart has a policy, written or otherwise, requiring "due process" prior to termination.  Instead, Lee attempts to establish that Kmart has an unwritten "normal process" by referencing several other incidents involving terminated employees.  She argues that these other incidents demonstrate that Kmart had a usual practice of providing what she refers to as "due process," but did not utilize the practice in connection to her termination.

Lee relies primarily on an incident in 2008 involving LPAs Josh, Joel, and Adam, in which they made a "bad stop" by detaining and physically contacting someone who had not

---

policy.  There is nothing in the record indicating that Kmart's termination policy requires two violations.  Further, the fact that these four employees were fired after committing two termination-worthy offenses does not mean that Kmart discriminates when it fires an employee who only commits one termination-worthy offense.  It is undisputed that a violation of the "Hands Off" Policy subjects an employee to possible termination.

[20]    "Due process" in this context does not refer to the traditional concept of Due Process under the Constitution.  Instead, it is shorthand for the process to which Lee argues she was entitled prior to termination.

actually stolen any merchandise.  Based on what Lee heard, or overhead, Josh and Joel say, Lee believes that they knew they were being investigated and were given several opportunities to explain their conduct.  Even if these statements were not hearsay, the fact that the employees were aware that their conduct could result in termination is not evidence that *Kmart* provided them with any notice beyond that provided by the company training on the "Hands Off" and Workplace Violence Policies.  Nor is there any evidence, admissible or otherwise, that it was Kmart who initiated conference calls or interviews.  Thus, there is no evidence from which a reasonable fact-finder could find that Kmart had any sort of policy or practice of providing these types of opportunities to employees prior to termination.

Lee also relies on four ASO reports related to the termination of other LP employees who violated the Kmart "Hands Off" Policy.  Lee asserts that these reports are evidence that other employees were provided with opportunities that she was denied.[21]  The first incident involved a Caucasian LPA, Benjamin, who made physical contact with a shoplifter after the shoplifter's accomplice physically assaulted another Kmart associate.  According to the report, the accomplice who attacked the associate escaped and Benjamin believed that the shoplifter was the only lead for the police, who had not yet arrived.  Benjamin believed he was acting in defense of himself and others, while also trying to provide relevant information to the police officers.  The ASO report indicates that Benjamin provided a written statement of the incident and had one interview with Keith Cockriel the day after the incident.  The ASO consultant involved in this investigation is unknown, but the other decisionmakers were Ken Basil, Mike Smith, John Hargrove, and Laurel Ingram.  Despite a recommendation that Benjamin be given a final written warning, Basil persuaded the group to terminate Benjamin for violating the "Hands Off" Policy

---

[21]     For purposes of this discussion, the Court will overlook the fact that these reports contain multiple levels of inadmissible hearsay.

and going outside Kmart boundaries.  This report does not support Lee's argument that Benjamin was provided with additional "due process."  Benjamin provided one written statement of the incident and was provided one opportunity for an interview with Cockriel—the exact same process as afforded to Lee, who submitted one written statement and had one telephone conversation with Cockriel.[22]

The next incident involved an African-American LPC, Lonnie.  Lonnie was terminated after an incident in which he physically contacted a juvenile shoplifter.  The ASO report indicates that there were "discrepancies" between Lonnie's incident report and the statements provided by two different witnesses.  Lonnie was questioned about these discrepancies, and then terminated for violating the "Hands Off" Policy and falsifying the records.  According to the ASO report, Lonnie submitted one report prior to his termination, and was questioned once about the discrepancies between his report and the witnesses' statements.  He was provided with no additional "due process" beyond that provided to Lee.  Even if Lonnie had been provided with additional opportunities, that would only undermine Lee's argument that Kmart discriminates based on race, since Lonnie was African-American.

The third ASO report relates to the termination of Caucasian LPA Tyler, who was terminated after he physically contacted a shoplifter, who consequently stabbed him in the shoulder.  The ASO report reveals that statements were collected from all witnesses and Tyler was asked to submit a statement as well.  There is nothing indicating that Tyler was ever questioned, interviewed, or otherwise spoken to about his incident prior to his termination.  This report lends no support to Lee's argument that Tyler was provided with additional "due

---

[22]     Even if Lee does not characterize her telephone conversation with Cockriel as an "interview," it is undisputed that she had a conversation with him on September 17th.

process"—if anything, he was provided with less, and was terminated despite having been stabbed by the shoplifter.

Finally, Lee refers to an ASO report regarding an incident in which Caucasian LPC Thomas inappropriately used physical contact. Thomas reported to the District Loss Prevention Manager (Dan Hornickel) that he had grabbed a shoplifter's shirt, but omitted that detail from his written statement. Because of this discrepancy, Kmart managers sought additional clarification. Lee argues that Thomas was provided with extra opportunities to explain himself, whereas she was not. However, Thomas' situation is not similar to Lee's, because there were no ambiguities in or inconstancies between Lee's verbal statement, Lee's written report, and Ruby's witness statement. Unlike Thomas's situation, the materials provided to management in Lee's case created no discrepancies and there was no obvious need for further follow-up. Thus, Thomas was not similarly situated to Lee, because his investigation revealed inconsistencies necessitating supplementation whereas her investigation did not.

Lee has provided no evidence that Kmart provided *any* other similarly situated employees, let alone Caucasian employees, with specific notice of an investigation or additional opportunities to explain their conduct prior to their termination. Nor do the four cited incidents demonstrate a company policy of providing pre-termination opportunities for explanation beyond those afforded to Lee. Moreover, the record indicates that Lee did, in fact, have notice of possible termination and multiple opportunities to describe the episode and explain her conduct. She was not specifically notified she was being investigated, but she understood that the Workplace Violence Policy prohibited acts of violence in the workplace, including slapping, and if she engaged in such acts of workplace violence she could be terminated. Lee also understood that the "Hands Off" Policy prohibited employees from touching suspected shoplifters' bodies,

21

clothes, or possessions, only permitting such contact if it was "necessary" for self-defense.  It is also undisputed that Lee had two opportunities to explain the incident—once on the phone with Cockriel, and once when she provided a written statement.  Nothing in the record would support a finding that Lee was denied any opportunities that were provided to other similarly situated employees.

### 3.  *Change in Proffered Reason*

Lee argues that "neither of Defendant's shifting explanations for Ms. Lee's termination have any basis in fact."  Pl.'s Mem. Opp. 21.  The "shift" to which Lee refers appears to be the fact that her termination papers indicated that she was being terminated for violating Kmart's Workplace Violence Policy, but Kmart now asserts that Lee was terminated for violating the LP "Hands Off" Policy.  Lee argues that because her conduct was evaluated under the Workplace Violence Policy, "it is not believable that she was terminated for violation of the LP policy."  Pl.'s Mem. Opp. 24.  This, however, is not a "shifting" explanation—Lee's physical contact with a customer was always the proffered reason for her termination.  In fact, Kmart argues that Lee's conduct violated *both* policies, and the evidence indicates that managers considered both policies when deciding upon Lee's termination.[23]  Even if Kmart did not initially consider the "Hands Off" Policy, but only considered the Workplace Violence Policy, the underlying conduct behind the termination has remained consistent.  Kmart "has not backed off from its original reason for

---

[23]      The record shows that Elliott believed Lee's conduct violated the Workplace Violence Policy, while Basil believed Lee's conduct violated the LP "Hands Off" Policy.  Smith agreed with both Elliott and Basil.  Together, Basil, Smith, and Elliott decided to terminate Lee's employment.  Lee argues that Basil was not part of the decisionmaking process, but it is undisputed that Basil spoke with Smith about Lee's incident.  There is no evidence to create a factual dispute that Basil considered the "Hands Off" policy when deciding Lee's conduct warranted termination.

terminating" Lee.  *See Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 855 (8th Cir. 2005).  "This is not a case of [Kmart] changing its story."  *See id.*

### 4.  *Inadequate Investigation*

Lee argues that Kmart's proffered explanation is unworthy of credence and has no "basis in fact" because Kmart's investigation was flawed in two respects—first, the individuals responsible for making the termination decision did not know that Lee was acting in self-defense and arrived at an incorrect conclusion; second, Lee's conduct was not analyzed under the correct company policy.  However, it is not the Court's role to decide if an employer's decision to terminate an employee is correct.  *See Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir.1995) ("[T]he employment discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination."); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995) ("[A]n employer has the right to . . . discharge—for good reason, bad reason, or no reason at all, absent intentional . . . discrimination." (internal quotation marks omitted)).  "To prove pretext, the employee must do more than show that the employment action was ill-advised or unwise, but rather must show that the employer has offered a 'phony excuse.'"  *Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1034 (8th Cir. 2005) (citation omitted).  The issue here is not whether Kmart's decision was correct, but whether Kmart acted "reasonably and in good faith."  *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 855 (8th Cir. 2005); *see also Johnson v. AT&T Corp.*, 422 F.3d 756, 762-63 (8th Cir. 2005) (explaining that "the proper inquiry is not whether [the employer] was factually correct" but whether the employer "honestly believed" the plaintiff had violated company policy).

Lee asserts in this suit that she used physical force because she felt threatened, and such use was permitted under the "self-defense exception" to Kmart's "Hands Off" Policy.  Thus, she argues, Kmart erroneously concluded that she violated company policy.  As previously discussed, there is nothing in the record to show that the individuals involved in the investigation or decisionmaking were aware that Lee took the position that she had acted in self-defense.  Nor is there evidence that this lack of awareness derived from racially motivated deliberate ignorance.  The fact that Kmart's decision may have been misinformed or even incorrect is not evidence that Kmart acted in bad faith or with discriminatory intent.  "[T]he showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee."  *Roeben v. BG Excelsior Limited Partnership*, 545 F.3d 639, 643 (8th Cir. 2008) (quoting *Johnson v. AT&T Corp.*, 422 F.3d 756, 763 (8th Cir. 2005)).  "A plaintiff must also demonstrate 'that the circumstances permit a reasonable inference' of discriminatory animus."  *Id.* (quoting *Johnson*, 422 F.3d at 763).  Here, there is no evidence that would permit such an inference.

Next, Lee argues that her conduct was erroneously evaluated under the Workplace Violence Policy, rather than the "Hands Off" Policy that applied specifically to LPAs and included a self-defense exception.[24]  Leslie Elliott, the HR consultant who recommended termination, believed that workplace violence was prohibited "regardless of the situation," even in cases of self-defense.  Elliott Dep. 23:16-24:8.  The "Hands Off" Policy, however, permits some very limited use of physical contact.  Lee argues that the Workplace Violence Policy does not apply to LP employees at all.  However, there is nothing in the record to support that

---

[24]     Even though the record shows that Basil did, in fact, consider the "Hands Off" Policy when deciding to terminate Lee, for purposes of this argument, the Court will assume that Basil played no role in this decision and only the Workplace Violence Policy was considered.

argument.  Even if the Court were to assume that the Workplace Violence Policy does not apply to LP employees, and that Elliott was entirely mistaken in her analysis of Lee's incident, there is no evidence that Elliott's misunderstanding, misapplication of company policies, and resulting erroneous recommendation to terminate Lee's employment were dishonest or based on racial discrimination.

Lee has presented no evidence that Kmart's investigation or resulting decision was "phony," conducted in bad faith, or motivated by intentional discrimination.  At most, Kmart's decision was just plain wrong—which is unfortunate, but not actionable under Title VII or the MHRA.  Lee has not presented any evidence that would allow a reasonable juror to find that Kmart's proffered explanation is "unworthy of credence."  *See Pye*, 641 F.3d at 1021 (internal quotation marks omitted).

Viewing the record in the light most favorable to Lee, no reasonable fact-finder could conclude that Kmart's proffered reason for terminating Lee was pretextual.  Further, it is not enough for a plaintiff to merely prove that an employer's proffered explanation is pretext—the plaintiff in a racial discrimination case must prove that the proffered reason is pretext *for racial discrimination*.  *See Pye*, 641 F.3d at 1019.  Lee must show that a "prohibited reason, rather than the proffered reason, actually motivated the employer's action."  *Id.* (internal quotation marks omitted); *see also Rose-Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1108 (8th Cir. 1998) ("[A] plaintiff can avoid summary judgment only if the evidence considered in its entirety (1) creates a fact issue as to whether the employer's proffered reasons are pretextual and (2) creates a reasonable inference that [race] was a determinative factor in the adverse employment decision." (internal quotation marks omitted)).  Even if Lee were able to make a triable showing that Kmart's proffered reason was pretext for *something*, she has not provided evidence from

which a reasonable fact-finder could conclude that it was pretext for racial discrimination.  Lee

points to not one Kmart decisionmaker or investigator who she alleges was racially motivated.

Nor does she point to any evidence that race played a role in Basil, Smith, Elliott, or Lawler's

decision to terminate her employment.  The only evidence that race factored into the termination

decision at all was Cockriel's statement that Lee was the "true victim" of the companion's

offensive speech and that at most "minor discipline" was appropriate.  Cockriel was fighting *for*

Lee's continued employment—he was requesting leniency.  Lee also cannot show that Kmart's

proffered explanation is "unworthy of credence."  There is no evidence that any alleged defects

in Kmart's investigation or decisionmaking process were made in bad faith or with racial

animus.  Because Lee raises no genuine dispute of material fact regarding pretext, Kmart is

entitled to summary judgment on Lee's discrimination claims.

## III.   CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1.  Kmart's Motion for Summary Judgment [Docket No. 12] is GRANTED.

2.  Summary judgment is GRANTED on Lee's Title VII and MHRA claims.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  December 21, 2011

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge